IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 15-CR-2613-GPC |
| Plaintiff, | ) ) | **ORDER DENYING MOTION TO SUPPRESS POST-ARREST STATEMENTS** |
| vs. | ) ) | |
| | ) | [ECF No. 22, 35] |
| SOCORRO HERNANDEZ, | ) ) | |
| Defendant. | ) ) | |

Defendant Socorro Hernandez ("Defendant") moves to suppress her post-arrest statements, and for an evidentiary hearing regarding the voluntariness of her post-arrest statements. Def. Mot., ECF No. 22, Def. Supp. Mot., ECF No. 35. The United States has opposed. Gov't Opp., ECF No. 26. An evidentiary hearing was

held on December 18, 2015 at which time Homeland Security Special Agent A. Medina testified. Upon review of the moving papers, video recordings offered by the parties, the applicable law, and for the reasons set forth below, the Court hereby **DENIES** the motion to suppress statements.

## FACTS

On October 2, 2015, at approximately 5:27 p.m., Defendant Socorro Hernandez applied for admission into the United States through the vehicle lanes at the San Ysidro, California, Port of Entry. *See* Def. Mot., Ex. A. Hernandez was driving a 1996 Plymouth Grand Voyager and was accompanied by two of her children. *Id.* A Customs and Border Protection ("CBP") Officer subjected her vehicle to a customary search and found several packages wrapped in masking tape concealed in a panel inside the vehicle's trunk. *Id.* A secondary search of the vehicle revealed a total of five packages, containing a total of 2.96 kilograms of methamphetamine. *Id.* Hernandez was then placed in hand restraints and escorted to the security office. *Id.* An eight-minute video recording taken at the security office shows Hernandez being searched while her one year old son, Gustavo, is heard in the background crying throughout the twelve-minute recording. *See* Def. Mot. Ex. to ECF No. 35.

More than four hours later, at approximately 10:58 p.m., Homeland Security Investigations Special Agents ("SAs" or "Agents") Alvin Medina and Hugo Leon

began questioning Hernandez in an interview room at the Port of Entry. *Id*. This interrogation took approximately 30 minutes. *Id.* During the interrogation, Hernandez's children were waiting outside the interrogation room. *See* Hernandez Decl. 2, Def. Mot., Ex. B, ECF No. 23. At the outset, Agent Leon tells Agent Medina that he is "going to give a little spiel." *See* DVD Copy of Hernandez's Post-Arrest Interview ("Hernandez Interview"), Gov't Opp., Ex. 4, lodged as ECF No. 27. He then makes the following statement to Hernandez:

> So basically, every time there's one of these on there, they call us. We come down here, we're investigators for the government. We don't work here. So part of the investigation consists of us talking to all the officers that were involved, the guys at the booth, the guys walking around out there, the guys with the dogs, and the guys in the x-ray machine. Besides talking to all the officers that were involved, I'm not sure who was involved in your case today or not, we require that each one of them gives us a report. From all the reports that we gather, we write one report. The whole case is based off our report. That's what goes to lawyers and the judge. So basically, we like to turn in complete reports. And in order to do that, you know, there's two versions to the story. We got theirs; we want yours. So, we want to be able to talk to you, we want to be able to ask you questions about what happened, but in order to do that, we gotta read you your rights, and from there you've gotta make a decision whether you want to talk to us about what happened here today or not.

Agent Medina then reads to Hernandez from a pre-printed Statement of Rights form.[1] After reading out each right, Agent Medina asks Hernandez if she

---

[1] The form lists a defendant's rights as follows:
   You have the right to remain silent.
   Anything you say can be used against you in a court of law, or other proceedings.
   You have the right to consult an attorney before making any statement or answering any questions.
   You have the right to have an attorney present with you during questioning.

3

understands each statement, whereupon Hernandez says "yes" and initials next to each right. Gov't Opp., Ex. 5.

| | |
|---|---|
| Hernandez: | The thing is about what? |
| Agent Medina: | Why you're here. |
| Agent Leon: | Why you're here. |
| Hernandez: | Yeah that's why. 'cause they just told me, you just need to check more your car, that's it. |
| Agent Leon: | There was narcotics found in your vehicle. Do you want to talk about that, yes or no? |
| Hernandez: | While I don't have, I don't even know about that. |
| Agent Leon: | Well I mean we can talk about it, but we need to know, since there's no lawyers on standby, well basically, we're asking your permission to talk to you without a lawyer being here. |

Hernandez then shrugs and makes a non-committal sound, whereupon Agent Leon says, "Are you good with that? I need you to read this out loud," gesturing at the waiver statement on the Statement of Rights. *See* Gov't Opp., Ex. 5. Hernandez then reads aloud the statement, "I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Agent Medina then asks again, "Are you good with that? It's your right," whereupon Hernandez says "Yeah." Hernandez then prints and signs her name on the Statement of Rights as directed by Agent Medina. Hernandez Interview 11:00.

---

If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.
*See* Gov't Opp., Ex. 5.

4

Hernandez then gives a statement to the agents denying knowledge of the narcotics found in her car. (Hernandez Interview 11:30-30:00.)  Fifteen minutes into the interrogation and four minutes following Hernandez's Miranda waiver, the crying of a child can be heard in the background.  Ms. Hernandez's demeanor remains unchanged and her account denying knowledge remains the same.

## DISCUSSION

### I. Motion to Suppress

Hernandez makes two principal arguments in favor of suppressing her post-arrest statement: (1) the agents' *Miranda* warnings were inadequate; and (2) Defendant's *Miranda* waiver, as well as her post-arrest statements, were involuntary because of the psychological pressure induced by the presence of her children at the border patrol facility.

#### a. Adequacy of *Miranda* warnings

Hernandez argues that the agents' *Miranda* warnings were inadequate. Def. Mot. 4. Individuals possess the right to be informed, prior to custodial interrogation, "that [they have] the right to the presence of an attorney, and that if [they] cannot afford an attorney one will be appointed for [them] prior to any questioning if [they] so desire [ ]." *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002) (alteration in original) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). "What *Miranda* requires 'is

meaningful advice to the unlettered and unlearned in language which [they] can comprehend and on which [they] can knowingly act.' " *U.S. v. Connell*, 869 F.2d 1349, 1351 (alteration in original) (quoting *Coyote v. U.S.*, 380 F.2d 305, 308 (10th Cir. 1967)). "In order for the warning to be valid, the combination or the wording of its warnings cannot be affirmatively misleading." *San Juan-Cruz*, 314 F.3d at 287 (citing *Connell*, 869 F.2d at 1352). The warning must be clear and not susceptible to equivocation. *Id.*

Hernandez argues that the adequacy of the agents' *Miranda* warnings was undercut by the statements they made before and after reading the *Miranda* warnings. First, Hernandez argues that Agent Leon's statement "The whole case is based off our report. That's what goes to lawyers and the judge." is misleading because it suggests that "if Ms. Hernandez did not answer the agents' questions, she would not have an opportunity to present her case to the judge or jury at a later time." Def. Mot. 5. Second, Hernandez argues that Agent Leon's statement that "there's no lawyers on standby," even if objectively true, "undercut the importance of [her] right to counsel" because it "failed to clarify" that she "had the right to wait to speak with the agents until a lawyer could be present." *Id.* Third, Hernandez argues that it was misleading for Agent Leon to state that the agents were there to get both "'versions to the story'" when in fact the agents "had already made up their minds that [she] was guilty." *Id.*

After reviewing the record and the video of the interrogation, the Court does not agree with Hernandez that the agents' *Miranda* warnings were inadequate. While Agent Leon's statement that "[t]he whole case is based off our report" could be viewed as misleading, the pre-printed Statement of Rights provided to Hernandez, as well as several statements by the agents, affirm Hernandez's right to be legally represented by counsel in her defense. *See* Gov't Opp., Ex. 5. Agent Medina read each right to Hernandez from the form, and Hernandez verbally acknowledged and initialed next to each right. Hernandez's demeanor when being apprised of her rights, as well as throughout the interview, was calm and lucid, and Hernandez gave no impression that she lacked the linguistic or emotional capacity to understand those rights.

Similarly, Agent Leon did (accurately) state that "there's no lawyers on standby," but the Statement of Rights made clear that she "ha[d] the right to consult an attorney before making any statement or answering any questions," "ha[d] the right to have an attorney present with you during questioning," and that "[i]f you cannot afford an attorney, one will be appointed for you before any questioning, if you wish." *See* Gov't Opp., Ex. 5. Before the agents question Hernandez, they have Hernandez read aloud the waiver, which states "I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."

1 And Agent Leon also states that "we're asking your permission to talk to you
2 without a lawyer being here."
3 Finally, whether the agents had "made up their minds" prior to questioning
4 Hernandez is both impossible to discern from the interrogation, and immaterial to
5 the adequacy of the *Miranda* warnings, which depends on the extrinsic
6 communications between the agents and Hernandez, not the agents' internal states
7 of mind. Taken as a whole, the Court finds that the agents provided Hernandez
8 with adequate *Miranda* warnings.

         **b.**    **Voluntariness of *Miranda* waiver and post-arrest statements**

10 Hernandez argues that her decision to waive her *Miranda* rights, as well as
11 her post-arrest statements, were not voluntary, knowing, and intelligent because
12 "she was concerned about the well-being of her children the entire time." Def.
13 Mot. 9.
14 The government bears the burden of proving by a preponderance of the
15 evidence that a criminal defendant knowingly, intelligently, and voluntarily waived
16 his *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 608, n.1 (2004). The Court
17 must assess the voluntariness of an admission under the " 'totality of all the
18 circumstances—both the characteristics of the accused and the details of the
19 interrogation.' " *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (citing
20 *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). An involuntary confession

violates the Due Process Clause of the United States Constitution and is inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In determining whether a statement is "voluntarily made . . . the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

Hernandez argues that "she felt that she had to answer the[ agents'] questions because she wanted to be sure she had the opportunity to contact family members to come to the port of entry and pick up the children. Ms. Hernandez feared if she did not answer the agent's questions, they would contact Child Protective Services. Ms. Hernandez believed that any effort to assert her rights could result in her children being taken from her." *Id.*

However, it appears that Hernandez was already afforded "the opportunity to contact family members to come to the port of entry and pick up the children" prior to the interview. Twenty minutes into the interview, Hernandez states that she called her husband to have him pick up the children, and when he did not pick them up, she made a second call to her uncle. Hernandez Interview, 20:00. Moreover, it was not the agents who first brought up the subject of Hernandez's children. Hernandez's children are not discussed until 18 minutes into the interview, at which point Hernandez cites the presence of her children in the car as

a reason why she would not smuggle narcotics. The agents reply that "people do it all the time." *Id.* at 18:00. Hernandez replies that she has "five kids, you think I'm going to put them in that," to which Agent Medina responds, "you're running the risk of losing your children right now." *Id.*

Hernandez cites *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) for the proposition that the agents' reference to her children caused her will to be overborne such that her post-arrest statement was the product of coercion. Def. Mot. 8. However, in *Tingle*, it was the totality of the circumstances of the interrogation that the court found rendered it coercive. In *Tingle,*

> Agent Sibley recited a virtual litany of the maximum penalties for the crimes of which Tingle was suspected, totaling 40 years imprisonment. He expressly stated, in a manner that could only be interpreted in light of the lengthy sentences he had described, that Tingle would not see her two-year-old child "for a while." Referring specifically to her child, Sibley warned her that she had "a lot at stake." Sibley also told Tingle that it would be in her best interest to cooperate and that her cooperation would be communicated to the prosecutor. He also told her that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed."

*Id.* at 1336. As a result of Sibley's techniques, "During Sibley's interrogation Tingle began to sob. She was noticeably shaking. She continued to cry for at least ten minutes." *Id.* at 1334. The court found that all of these aspects of the interrogation "must be read together, as they were intended to be, and as they would reasonably be understood. Viewed in that light, [the agent's] statements were patently coercive." *Id.* at 1336.

Here, Agent Medina did state that Hernandez might lose her children as a result of the arrest. However, the statement was made after Hernandez had waived her Miranda rights and elected to give a statement denying any knowledge of the presence of drugs in the load vehicle. In addition, the other coercive features identified by the Ninth Circuit in *Tingle* are not present. The agents did not threaten Hernandez with a lengthy prison term or an unfavorable report for noncooperation. Moreover, Agent Medina's sole statement to that effect only comes more than halfway through the interview in response to Hernandez offering the presence of her children as a reason why she would not commit drug smuggling. Neither Hernandez nor the agents mention her children prior to this point in the interview, and at no point in the interview does Hernandez appear to be shaken or emotionally distraught by the agents' statements. This situation is more like that distinguished by the *Tingle* court in *United States v. McShane*, 462 F.2d 5 (9th Cir. 1972), where the Ninth Circuit found a confession voluntary where "the officers had a legitimate reason for bringing the defendant's [loved one] to the station house for questioning; . . . the defendant had no reason to believe that his confession would serve to protect his [loved one], because he had been told that she was free to leave the station house prior to the time he confessed; . . . [and] the court said that the record did not reflect that the defendant felt great psychological stress." *Tingle*, 658 F.2d at 1337. Here, Hernandez did not show any psychological

stress and the agents did not use the presence of the children, or what would happen to them, as a means to break her down so that she would confess.

Moreover, there is no evidence that Hernandez had a particularly vulnerable physical condition or mental state or was unreasonably deprived of food or sleep. Hernandez did not present in a manner to suggest her age, intelligence, or education made her susceptible to coercion.

Finally, Hernandez has advanced the additional argument that the interrogation was coercive because one of her children could be heard crying in the background. Def. Supp. Mot. 2. This crying is somewhat audible in the DVD of Hernandez's pat-down search in the security office and in her interrogation from 17:30 onwards. Hernandez Interview 17:30.

While the Court sympathizes with Hernandez's feelings as a parent, the Court declines to find that the circumstance of a defendant being interrogated with a crying child outside the room renders an interrogation inherently coercive. It is plain that Hernandez waived her *Miranda* rights hours after her one-year-old was initially crying in the security room, and that her demeanor was unaffected by the crying that occurred during her interview, which did not begin until after Hernandez had already waived her rights and agreed to be interviewed. *See* Hernandez Interview 17:30-30:00. Most notably, Hernandez stood by her statement denying knowledge of the drugs found in the vehicle.

### c. 18 U.S.C. § 3501(b)

Title 18 United States Code Section 3501(b) sets forth five factors which a court must review to determine whether a statement is voluntarily made. These factors include: (1) the time elapsing between arrest and arraignment of the defendant, (2) whether the defendant knew the nature of the offense with which she was charged at the time of making the confession, (3) whether the defendant was aware that she was not required to make any statement and that any such statement could be used against her, (4) whether the defendant had been advised of her right to counsel; and (5) whether counsel was present at the time of defendant's confession. 18 U.S.C. 3501(b); *U.S. v. Shi,* 525 F.3d 709, 730 (9th Cir. 2008). No one factor is necessarily conclusive on the issue of voluntariness of a confession. *Id.*

With respect to § 3501(b), four of the five statutory factors weigh in favor of finding Defendant's statement voluntary.  First, Defendant did not complain of an unreasonable delay in time between her arrest and arraignment. Second, Defendant was informed by the agents of the nature of her crime at the beginning of the interview. Third, as discussed above, the agents adequately advised Defendant of her Miranda rights, including necessarily the right to remain silent; and, fourth, the right to the presence of counsel during the interview. Fifth, no attorney was present when Defendant gave her statement to the agents, but there is no evidence that any

of the statements were extracted by use of threat, violence, or psychological pressure. Accordingly, this Court finds that Defendant's waiver of her Miranda rights was knowing, intelligent, and voluntary. Hernandez's statement was voluntary.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress, ECF Nos. 22 and 35, is hereby **DENIED**.

**IT IS SO ORDERED.**

Dated: February 19, 2016

Hon. Gonzalo P. Curiel
United States District Judge